IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 08-cr-30101-MJR-CJP |
| | ) |
| HERMAN WESLEY OSWALT, | ) |
| | ) |
| Defendant. | ) |

Memorandum and Order

REAGAN, District Judge:

A. **INTRODUCTION**

A May 22, 2008 indictment charges Herman (a/k/a "Oz") Oswalt – a prior felon – with possessing a Ruger semi-automatic .40 caliber pistol (Count 1) and seeks forfeiture of that firearm (Count 2). Defendant Oswalt appeared before Magistrate Judge Proud on May 28, 2008, waived his preliminary hearing and entered a not guilty plea. Trial was set for July 14, 2008 and continued by the undersigned District Judge on Oswalt's motion, which was filed with a speedy trial waiver.

After the undersigned Judge granted Oswalt additional time in which to do so, Oswalt filed a motion to suppress evidence. The need to brief that motion and hold an evidentiary hearing thereon resulted in trial being continued to November 3, 2008. A hearing was conducted October 3, 2008 on Oswalt's motion.

The parties' memoranda supporting and opposing suppression thoroughly frame the issues before the Court. At the October 3rd hearing, five witnesses presented

testimony, and the Court took Oswalt's motion under advisement. For the reasons explained below, the Court now DENIES Defendant Oswalt's motion to suppress evidence.

B. **ANALYSIS**

Herman Oswalt ("Defendant") moves this Court to suppress evidence obtained during a May 8, 2008 search of a residence and outbuilding/garage located at 1611 Hastings in Alton, Illinois. That property is owned and occupied by Benjamin Oswalt and his wife, Kathryn Oswalt. Benjamin and Kathryn are Defendant's brother and sister-in-law. The question is whether there was a valid consent for the search. Analysis starts with the events that culminated in that search.

In the Spring of 2008, the Drug Enforcement Administration ("DEA"), working with local police officers on a narcotics task force,[1] were investigating the "Invaders Motorcycle Club" for drug trafficking and three unsolved murders. During that investigation, the DEA learned that an Invaders member named Alan Little had been missing since May 31, 2007. While following up on information relating to Little's disappearance, DEA Special Agent Greg Pond learned that Herman Oswalt, a prior felon, (1) might be involved in Little going missing, and (2) might be storing weapons at 1611 Hastings in Alton. Surveillance of 1611 Hastings began.

During May 8, 2008 surveillance of 1611 Hastings, Agent Pond, along with and other agents and Task Force Officers (collectively referred to as "officers" herein),

---

[1] This task force is referred to in materials presented with the suppression motion (Exhibit B to Doc. 22) as the "St. Louis County, Missouri, Multi-Jurisdictional Drug Task Force."

observed two persons leave the residence and get in a car. The officers followed the car across a bridge from Illinois and into St. Louis County, Missouri. Ultimately, the officers stopped the vehicle for traffic violations, including speeding and improper registration. The traffic stop occurred at Highway 367 and Parker Road. Benjamin Oswalt was driving the vehicle. When the officers "ran" Benjamin's license, they learned of an outstanding warrant or violation in St. Louis County. Benjamin was arrested, taken into custody by a St. Louis County police officer and transported to a St. Louis County holding facility.

Kathryn Oswalt ("Mrs. Oswalt"), the passenger, was not arrested. Mrs. Oswalt, who had the couple's dog in the car with her, was specifically told she was *not* under arrest. Task Force Officer Jeremiah Henning, a detective with the St. Louis County Police who works with the DEA, advised Mrs. Oswalt that the Task Force was investigating the disappearance of Alan Little, had "intelligence" that Little stashed some belongings at 1611 Hastings before he disappeared, and also believed there might be firearms at the property. While at the site of the traffic stop, with Mrs. Oswalt in the front passenger seat of his vehicle, Detective Henning asked for permission to search the property.

Mrs. Oswalt agreed to the search, both orally consenting and then signing a written consent form. Task Force Officer Christopher Eaves, who was standing outside the front passenger window of Detective Henning's vehicle, was present for and heard Henning's conversation with Mrs. Oswalt, heard her consent to the search of the property, and watched her signed the written consent form.

The "Consent to Search Form" signed by Mrs. Oswalt at 1:20 pm on May 8, 2008 was admitted into evidence, without objection, as Government's Exhibit 1 at the October 3, 2008 hearing. The document is captioned "Consent to Search," appears to be a pre-printed form of the St. Louis County Police Department, was signed by Mrs. Oswalt and Detective Henning, and was witnessed by Officer Eaves. Mrs. Oswalt rode back to 1611 Hastings with Detective Henning.[2]

Once at 1611 Hastings, Henning and Eaves advised DEA Agent Pond that Mrs. Oswalt had consented to a search and showed Agent Pond the written consent form she had signed. Pond asked Mrs. Oswalt "if it was okay for us to search," and she said yes.

Officer Eaves and Detective Henning sat with Mrs. Oswalt in the living room of her home (Mrs. Oswalt sat on the couch), while other officers conducted the search. Neither Eaves nor Henning ever heard Mrs. Oswalt withdraw her consent to search or ask anyone to cease searching.

Mrs. Oswalt herself testified at the suppression hearing that she never told the officers to stop and never withdrew her consent. She explained that although she was uncertain whether she had the *right* to allow them to search, she did consent to the search, never "felt like" telling them to stop and never asked them to stop searching.

---

[2] Benjamin's car was searched, secured and moved off the highway. The record is not clear as to whether the Oswalt's dog rode back with Mrs. Oswalt and Detective Henning to 1611 Hastings.

In fact, when told that the officers had reliable information that there were weapons on the property, Mrs. Oswalt alerted the officers that there was a small "grow-room" of marijuana in the basement of the house.[3]

The search began in a garage or outbuilding, where the officers located suspected silencers, blasting caps, an explosive precursor and 12 to 15 firearms. They relayed these discoveries to Mrs. Oswalt, who told them there was – or had been – another gun in the house, in Herman's room, in a safe.

She informed the officers that her brother-in-law Herman (Defendant) stayed in the spare bedroom of the house from time to time, and she had seen him put a gun inside a small safe and lock it. She advised the officers, however, that she was not sure if the gun was still there, as she believed Herman might have recently sold the gun, which she referred to as a "Ruger" or a "Luger."

Mrs. Oswalt walked the officers through the home, down the hallway and identified Herman's bedroom. Looking in the room, the officers saw a motorcycle, various motorcycle-related items (e.g., an "Invaders" jacket and an "Invaders" vest) plus plaques and other belongings of Defendant Herman Oswalt, some of which had his name or nickname ("Oz") on them. The officers then contacted the Alton Police Department, and a search warrant was obtained at 6:32 pm from the Circuit Court of Madison County, Illinois (*see* Doc. 22-3). The search of the bedroom then resumed.

---

[3] Later, just as Mrs. Oswalt had described, the officers found marijuana plants in the basement of the home at 1611 Hastings. *See* Doc. 22-3, ¶ 10, furnished with Defendant's motion.

Inside that bedroom, officers found documents with Defendant's name (e.g., insurance bills and mail), prescription bottles, photos, and rifle ammunition in a box containing letters and memorabilia. They located a small Sentry brand safe, opened it, and found a Ruger .40 caliber semiautomatic pistol handgun plus additional ammunition.[4]

Defendant challenges the consent given by Mrs. Oswalt to the May 8, 2008 search. Defendant's argument rests on a telephone conversation that Mrs. Oswalt had with defense counsel (Steve Williams) four weeks later. During a June 5, 2008 phone call to attorney Williams, Mrs. Oswalt suggested that she either did not consent to the search or did not understand what she was consenting to when she gave her permission for the search.

Contrary to that suggestion, the evidence at the hearing, including the testimony of witnesses called by both the United States and Defendant Oswalt, clearly established that the search followed a valid, voluntary consent which was never withdrawn at any point before or after the warrant was obtained.

Indeed, when questioned by defense counsel Williams, Mrs. Oswalt testified that (1) she *wanted* to cooperate with the officers on May 8th, (2) she cooperated with them "all along," (3) she probably lied to Williams during the June 5th phone conversation because her husband had dialed the phone, handed it to her to talk and continued to

---

[4] The indictment charges possession of the Ruger and the ammunition found in Defendant's room; it does not charge Defendant with any offenses relating to the firearms and explosives found in the garage/outbuilding.

stand right by her listening to her conversation with Williams, and (4) concerned and nervous on June 5th, she thought she had better try to "protect" her brother-in-law.

Stated simply, Mrs. Oswalt's June 5th statements to Mr. Williams were false and/or not credible, the officers properly obtained oral and written consent from Mrs. Oswalt, and the record before this Court is utterly devoid of evidence warranting suppression.

The Fourth Amendment to the United States Constitution "protects against warrantless intrusions by the government into areas in which [an] individual holds a reasonable expectation of privacy." *United States v. Villegas*, 495 F.3d 761, 767 (7th Cir. 2007), *cert. denied*, 128 S. Ct. 939 (2008), *citing United States v. Yang*, 478 F.3d 832, 835 (7th Cir. 2007).

A defendant seeking to suppress the fruits of a search "bears the burden of demonstrating both that he had an actual subjective expectation of privacy and that the expectation 'is one that society is prepared to recognize as reasonable.'" ***Villegas*, 495 F.3d at 767**. To determine whether a defendant held a subjective expectation of privacy, the Court looks at the defendant's efforts to keep private that which was the subject of the search. *Id.* Whether that expectation of privacy was *reasonable* is "necessarily fact dependent" and "must be determined on a case-by-case basis." *Id.*

Defendant maintains that he had an expectation of privacy in his Benjamin and Kathryn's home, because "at the very least, he was an overnight guest in the home over a period of time" (Doc. 22, p. 3, *citing Minnesota v. Olsen*, 495 U.S. 91, 97-98

(1990)). The Government counters that, even if Herman had a legitimate expectation of privacy in the home, Kathryn – a co-owner of the home who had common authority over the premises – had the right to consent to a search of the home. The Court finds that Herman had a reasonable expectation of privacy in the bedroom he stayed in at 1611 Hastings, but Mrs. Oswalt had the authority (and did) consent to a search of the entire property, including the bedroom in question.

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), establishes the bedrock principle that consent to search must be given voluntarily.[5] Whether consent was given voluntarily is "a question of fact to be determined from the totality of the circumstances," *id.* at 227. The Government bears the burden of proving that consent was freely given. *United States v. Johnson*, 495 F.3d 536, 541 (7th Cir.), *cert. denied*, 128 S. Ct. 725 (2007).

In making that determination, the relevant factors to be assessed by the Court include the age, education and intelligence of the consenting individual, how long she was detained before consenting, whether consent was given only after repeated requests, whether the person was in custody at the time she consented and whether there was any physical coercion by the officers. *Johnson*, 495 F.3d at 542.

---

[5] It bears note that "knowledge of a right to refuse is not a prerequisite of a voluntary consent," *Schneckloth*, 412 U.S. at 233. The Fourth and Fourteenth Amendments require only that where the government justifies a search based on a consent, the government "demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion." *Id.*

Analysis of those factors in the case at bar leads to a single conclusion – Mrs. Oswalt's consents (both oral and written) were given voluntarily. She was not under arrest when she consented. She was not peppered with repeated entreaties before she consented. She was neither elderly nor infirm nor too young to understand what she was being asked.

Additionally, Mrs. Oswalt had prior felony and misdemeanor offenses, had been on probation for a drug-related offense for a number of years, and possessed some familiarity with law enforcement/legal procedures. Moreover, Mrs. Oswalt *wanted* to cooperate, partly because she considered Alan Little (the missing person) to be a friend and partly because she was not worried about what they would find during the search (other than the small marijuana "grow room" she told them about up front).

No coercive or heavy-handed tactics were used to secure the consent. Mrs. Oswalt testified that Detective Henning never told her she "had to" agree to the search, and none of the officers coerced her into consenting. Furthermore, Mrs. Oswalt noted that if she had to do it all over again, she would "do nothing different" and, regardless of what she did or did not say to attorney Williams on the phone on June 5th, she certainly did consent to the search on May 8th.

Mrs. Oswalt had common authority over the home and garage at 1611 Hastings. A joint occupant with common authority over, or other sufficient relationship to, a residence can consent to search the residence. *See United States v. Matlock*, 415 U.S. 164, 171 (1974); *United States v. Ryerson*, - F.3d -, 2008 WL 4248193 (7th Cir.

Sept. 18, 2008); *United States v. Brown*, 328 F.3d 352, 356 (7th Cir. 2003), *cert. denied*, 540 U.S. 1113 (2004). Mrs. Oswalt did so here.

The consents (oral and written) were not the product of any duress or coercion. They were freely and voluntarily given. The search of Defendant's room violated no constitutional provision or guarantee, was consensual and was further supported by a search warrant obtained by the officers before they opened the safe.

This case does not fall within the ambit of *Georgia v. Randolph*, 547 U.S. 103 (2006), or raise concerns regarding an occupant's consent-to-search being invalidated by a physically present co-occupant's refusal.[6]

Rather, the case *sub judice* is more akin to the search in *United States v. Reed*, 539 F.3d 595, 598-99 (7th Cir. 2008). One occupant voluntarily consented to the search, the co-occupant was absent due to a valid arrest, and the police did not execute the arrest for the purpose of preventing the co-occupant from voicing objection to the search. *See also United States v. Hicks*, 539 F.3d 566, 569 (7th Cir. 2008); *United States v. Wilburn*, 473 F.3d 742, 745 (7th Cir.), *cert. denied*, 127 S. Ct. 2958 (2007); *United States v. DiModica*, 468 F.3d 495, 499 (7th Cir. 2006); *United States v. Parker*, 469 F.3d 1074, 1078-79 (7th Cir. 2006).

---

[6] *Randolph* holds that a physically present occupant's *refusal* to permit entry prevails over a co-occupant's consent, rendering the warrantless search unreasonable as it affects the nonconsenting co-occupant. *Randolph* involved two persons standing at the threshold of the residence when the officers arrived. Only after the husband denied consent did the officers get consent from the ex-wife, who was present there at that moment with her husband.

C.  CONCLUSION

For all these reasons, the Court **DENIES** Defendant's motion to suppress (Doc. 22). Trial will proceed as scheduled at 9:00 am on Monday, November 3, 2008. Proposed jury instructions should be submitted to Judge Reagan's law clerk in the form described on Judge Reagan's web page no later than noon on the first day of trial.

IT IS SO ORDERED.

DATED this 10th day of October 2008.

s/ *Michael J. Reagan*
Michael J. Reagan
United States District Judge